6, Reed v. Nacogdoches County. We're sorry that various circumstances compelled us to hold argument this way rather than in New Orleans, but there it is. We are and the time clock makes it virtually impossible for you to ignore the timing on the wall. We have read your briefs and record excerpts. We have not necessarily gone into the full record, so we will appreciate your citations when those are appropriate. I would say that because we are on Zoom and communication is a little more awkward, we will, I will give you each five minutes uninterrupted if you choose to use it for your presentation before you're open to questions. So first, we will hear from Mr. Edwards. Thank you. May it please the court. This is a case that concerns the tragic death of Deontay Reed, a pretrial detainee at the Nacogdoches County Jail for three primary reasons. First, I'm sorry, not the death, an anoxic brain injury. I apologize. First, a control room operator ignored five or six emergency intercom calls, and as a direct consequence, care was delayed in getting to Deontay Reed, who had fallen from his bed, suffered a seizure, and was unable to breathe. Second, a licensed vocational nurse, Jennifer Ridley, was dispatched to see Mr. Reed. Despite knowing that he could not breathe, he was pulseless, and knowing that he needed emergency immediate CPR, she chose not to perform the service and treatment she knew that he needed. As a direct consequence, Mr. Reed remained unable to breathe, deprived of oxygen, and on his way to an anoxic brain injury. Third, the county and its sheriff are directly responsible for what happened for three primary reasons. First, the control room operator, Officer Fuentes, had a history of abusing her cell phone, of allowing dangerous activities to happen at the jail that any competent sheriff would have recognized precluded her from the important job of manning a control room whose primary responsibility was manning an emergency intercom system. Prior to the occasion in which she ignored the calls to help Deontay Reed, she had been cited for playing on her cell phone, horseplay, acting on the internet while in control room, an incredibly serious breach leading to criminal activity at the jail, guards and inmates engaged in PCP parties. These are actions that should not be tolerated, and while the sheriff did demote Ms. Fuentes, those are actions that she never should have been in this position because exactly what happened previously, her ignoring her job responsibilities, happened in this situation. On five different occasions, when the evidence is viewed in the light most favorable to the plaintiffs, over a period of three minutes, Officer Fuentes ignored emergency intercom calls, just like she ignored her responsibilities in the makes a decision to retain a dangerous employee, they are acting on behalf of the county. Secondly, the county had unsupervised licensed vocational nurses working in the jail, as a consequence, and what that means is under Texas law, every licensed vocational nurse has to be supervised by a nurse practitioner or a physician. That was not the case here, in the record you can see that for the last two months that Deontay Reed was in the jail, there was no supervising physician. While they could call out to an emergency room, or could schedule an appointment, there was no one supervising Nurse Ridley, no one supervising the other LVNs there, that's a violation of Texas law. As a direct consequence, Deontay Reed, who was prone to seizures, who was taking risperidone with a recommendation for as needed benzotropine, was never assessed. He was never monitored for whether or not he needed the benzotropine, despite the fact that risperidone has a side effect that is seizures. And finally, despite knowing that there was a need to train all of the correctional officers in CPR, because they were going to be the first responders to all medical emergencies, and despite knowing that there had been a need for CPR in the past, and despite knowing the obvious danger that not training officers in CPR poses, Sheriff Bridges decided not to train multiple officers at his jail, who happened to be the officers that encountered Deontay Reed. As a direct consequence, CPR was delayed. And I've reached my five minutes, so I'd open it up to questions, or I can continue, Your Honor. Well, I do sort of have a question about the, I'm somewhat troubled about the issue about the LVNs being unsupervised. But at the same time, I'm not sure that would have been a causal connection here, because Boy Scouts are trained to do, 10-year-olds are trained to do CPR. A lot of people are trained to do CPR. You don't have to be an LVN for that purpose. And so, I'm not sure that that's a material factor in what Mr. Reed suffered. Well, Justice Jones, I think you're right in terms of the causation analysis. Obviously, Boy Scouts can do CPR, which is why the delay here is so heinous. But in terms of the LVNs not being supervised, the significance of that is Mr. Reed suffered a seizure, and then fell to the floor. And the seizure was what precipitated the anoxic brain injury. Well, they don't know for sure. I mean, they may have determined, the medical professionals may have determined after the fact that he had a seizure. But all you had, all the call to the operator was man down. No, no, you're exactly right. In the moment of the man down, I don't disagree with you. The problem with having unsupervised LVNs in violation of Texas law is that no one monitored or assessed Mr. Reed. So, we don't know whether or not proper care would have recognized that he needed the benztropine on the side, which could have prevented the seizure in the first place. But again, I think you're exactly right. In terms of the actual event, the episode, we're not suggesting that that lack of supervision caused Nurse Ridley not to do CPR. She knew she had to do CPR. She absolutely categorically knew that she had to do CPR. And you can look on the record on appeal. Let me see this. 1484, you knew the situation called for CPR, right? Answer, yes. Despite knowing that, she abandoned her patient. And I want to take the court to, for me, the key is did Ridley have a culpable mental state? Did she act with, we would argue that objective deliberate indifference ought to be the standard under Kingsley, but I don't want to spend too much on that because Ridley was subjectively deliberately indifferent. Ridley did treat her patient incorrectly. Okay. I want to be crystal clear about that. Under Domino, under Easter, Nurse Ridley knew that CPR was necessary. She knew the patient was not breathing. She knew in the light most favorable to the plaintiffs that he didn't have a pulse. And she knew that if she did not perform CPR was likely to lead to a serious injury, a serious brain injury. That is textbook deliberate indifference. Despite knowing that she had a man in the throes of this episode, she abandoned her patient. Why did she abandon her patient? According to Ridley, it was to get a pulse oximeter. How do we know this? That is what the nurses told us. Ridley told them when she came back to the medical department, why are you here? I'm looking for a pulse oximeter. Now, the reason that's so significant is according to Ridley, she knew, I want to say that again. She knew a pulse oximeter was pointless. She testified there was no point to it. Just as a frame, frameable matter, under Easter, she delayed necessary care that she knew was going to cause substantial harm to this patient and treated him incorrectly. This is not a case about medical judgment. The district judge found that she was exercising her nursing judgment. We respectfully disagree with that characterization. Again, the hard part about civil rights law is that you have to thread the needle and you need to prove deliberate indifference. That requires subjective knowledge of a dangerous condition and conscious disregard of that. What makes the cases hard is on the front definition of deliberate indifference. We ought to be able to proceed because here again, a nurse found a pulseless, not breathing patient. She knew needed immediate emergency CPR and she didn't do it. Instead, she did something she said was pointless. That is just like Easter. I'm sorry, a little bit about the record, which I have not read. I thought she testified that she went to get a defibrillator and some other piece of equipment, oh, some kind of mask, as well as the oximeter. Let me address that. Well, is it correct that the EMT techs did do a defibrillator on him? Yes. An AED or a defibrillator would have been helpful. The problem with her after the fact explanation is that she didn't go get a defibrillator. She didn't tell people that a defibrillator was what she was looking for. In fact, the record will show she walked past the place where the defibrillator was not once, but twice on her way back. She went to get a pulse oximeter. Why do you think the judge overlooked that? Well, I think the judge believed that the decision to get equipment of any kind was judgment and that it was malpractice. I think the judge characterized this case as obvious case of malpractice and bad judgment, but nevertheless judgment. What I am suggesting to you under the record, however, is that when a nurse knows the care she is going to get is incorrect, it amounts to, under Domino and under Easter, a decision to purposely treat someone incorrectly. And the other key thing there is it is not correct that the nurse had to go, even if the defibrillator was the key to the castle, all the nurse had to do was radio through a guard, just like she said to radio 911, have someone bring that. They're not mutually exclusive. CPR is necessary as well as eventually a defibrillator, but CPR is what gets the heart going again so that it can work. But in any event, she knew and has testified she knew she needed to do the CPR and she testified she needed to do it immediately. And she testified that she knew Mr. Reed was not breathing. Now she subsequently denied that, but she told three of colleagues that Mr. Reed was not breathing. She testified to us that she knew CPR was necessary. She also testified to us that if it had been her child that she had been on the ground with, that she wouldn't have left, that she would have done emergency CPR, that she wouldn't have left for a CPR mask. This is basic stuff. As Justice Jones, you kind of pointed out, every Boy Scout would know this, okay, which is why the training allegation as to Sheriff Bridges is actionable under Monell. Well, I'm more dubious about that, but again, I haven't read his deposition. I'm dubious about what a parent, I mean, what I read in the briefs was that he wasn't training the guards on CPR because there was very high turnover at the jail, which I do not doubt. But the kind of people that you hire to be jail guards may not be the kind of people who are mentally equipped to assess prisoners in need, may not be mentally, may not be psychologically equipped to assess prisoners' needs for CPR, because the first rule of CPR is you don't do it unless somebody's heart is stopped, and you have to be very careful in figuring that out. So, it might be more dangerous to give them a little, because it can kill you if you do it wrong, right? Well, it's not that it kills you if it does it wrong, but I mean, I think it's either it's so easy that even a Cub Scout and a Boy Scout can be taught it, or it's beyond the realm. But in this particular case, why it's so pernicious, and I see my time is running out, if I could just finish this answer, why it's so pernicious is, while what you're saying could be an argument about not doing CPR until a medical professional arrives, here, this nurse left, knowing CPR was necessary. All she would have had to do is say to those officers, you start CPR, I'm going to leave, if she had to. Okay, so, I would respectfully suggest that when someone is not breathing, and when there is evidence of no pulse, as in the record, at 1052. We, yeah, we know, we know you're going on. Okay. You're recapitulating at this point, and you have time for rebuttal. Thank you. Thank you, Justice. Sure. Thank you. Is Mr. McGee here? Yes, Your Honor, he is. We had a plan for me to go first, but, I'm here, Your Honor. Oh, yeah, well, sorry, I missed you at the beginning. So, your first, Mr. Davis, is listed first, but I don't care who speaks first. Your Honor, I'll go ahead and go first, if that's okay. Robert Davis? Yes, sir. And Lieutenant Lee Correa, Your Honor, may it please the Court, we represent Nacogdoches County and Sheriff Bridges. I would like to just start out by saying that I think plaintiff's counsel, who I do respect, was a little fast and loose with the facts and the record. First of all, Mr. Reed is not dead. Can you speak up, please? Oh, yes, Your Honor. Sorry about that. I believe that Mr. Edwards, who I do respect, I believe he was a little fast and loose with the facts and the record. First of all, Mr. Reed is not dead. The plaintiff is very much alive and playing basketball today. Secondly, Jailer Fuentes was first contacted by Intercom. There is nothing in the record to suggest that she ignored any calls from Mr. Reed's cell. She received two calls, back to back. The first one didn't say much. And seconds later, she received another call saying that they had a man down. We're talking about a period of 20 seconds between the two calls. As soon as she received the man down call, she radioed it out over the jail radio, so that both correctional staff as well as medical staff was made aware that there was a man down. Four seconds after she made that call, Corporal Fountain and Officer Mobley arrived at the trap door to enter into the cell. Eight seconds after the initial call, Officer Hooper arrived at the cell itself. And 11 seconds later, the door, Dorm 1 door opened and they went in to check on Reed. Nurse Ridley responded to the scene rapidly. And when she entered the scene, it is not true that there was no pulse and no respiration. What she assessed is that there was a faint pulse and labored breathing. And four, I'm sorry, less than a minute later after that occurred, Puente is called 911. As soon as the nurse got into the dorm, she asked that 911 be summoned. And 911 was summoned, Your Honor. Nurse Ridley did leave the dorm to get the additional medical equipment. But at the time that she left, there was a pulse and there was breathing. And Your Honor, you're exactly right. Uh, if you start CPR on someone who's breathing and has a pulse, and this is in the record, the likelihood of killing them is substantially higher. CPR was not necessary at that time. When the nurse returned to the dorm and Nurse Moten also went to the dorm, that was when he was reassessed. There was no pulse and no breathing at that time. That was at 12-53-21. And compressions, chest compressions were started by Lieutenant Ray. The command staff is trained on CPR, Your Honor. And some staff in the jail is trained on CPR. They just aren't all trained on CPR. With that said, Your Honor, trying to correct those factual issues, this is a 14th Amendment denial of medical care claim and an ADA and RA claim. In this particular case, Your Honor, for the county and sheriff bridges to be held liable, they would have to show, and it's undisputed in the record, that the sheriff was either personally involved in this incident or that the sheriff failed to properly train and properly supervise the involved officers. Officer Fuentes and Nurse Ridley. And what the record actually shows, Your Honor, in this particular case, there was no underlying constitutional violation. And without an underlying constitutional violation, neither the sheriff nor the county can be held liable on a failure to train or failure to supervise claim. Even if they had proven an underlying constitutional violation, Your Honor, the plaintiff would have to prove, in addition, that there was a failure to train or failure to supervise that was the moving force behind those alleged constitutional violations. And then they would have to show that those failures to train and failure to supervise were done with deliberate indifference. And deliberate indifference in this context means a knowing disregard of a substantial risk of harm. There is nothing in the record to show that the sheriff, as a policymaker, knew of and disregarded a substantial risk of harm. And then third, Your Honor, the sheriff, even if they were able to establish all those facts, is entitled to qualified immunity in this case. As for the supervision of the nurses, Your Honor, a doctor does not have to be on scene to supervise LVNs. And there was a doctor available who the LVNs did report to and who saw inmates off-site. And I think, Your Honor, the case of Henson versus Wichita County has already resolved that issue of LVNs in a scope of practice situation and the difference between that and deliberate indifference to serious medical needs. Um, as for the prior policy violation of Defendant Fuentes, there was one violation, one violation and only one violation she's ever had. Seventeen months before this occurred and it involved a contraband situation where she was a supervisor at corporate. She did not engage in the bad conduct herself but it was noted that she was in a, a room and she was on her cell phone. She was reprimanded for that harshly. She was demoted from a corporal, a supervisor to a jailer and, uh, she was instructed not to engage in that type of activity in the future. Um, which is in and of itself training. Don't, don't play on your phone. In this particular case, as the sheriff testified, she was on the phone in the control room. That's why she was disciplined in this case. But she was also performing her duties at that time. The plaintiff says that she disregarded five emergency phone calls. Not true at all, your honor. She has two functions in addition to others but two primary functions in the control room which the record reflects. One, if a jailer beeps the button by a door leading into the jail, she flips a switch and the door opens. Now that occurred four times. She doesn't respond to the guard. She looks, sees it's a guard and flips the switch. In this case, she didn't disregard any, any emergency calls from the cell that Mr. Reed was in. Um, the plaintiff has absolutely failed to establish any evidence of a widespread practice or custom. The plaintiff has failed to show any practice or custom that was allowed to occur with deliberate indifference on behalf of the sheriff. Counsel, before we go to, to the policy and practice, can I just ask a factual question about the phone calls? So when I'm listening to the recording, the exhibit one recording of her phone call to the electric company, what are the noises? I thought that there was record testimony that the noises in the background are the emergency intercom calls from dorm one. What is your view about what those, those little beeps are? The noises in the background that the other side that Mr. Edwards says were the emergency intercom buses. What is your view about what those noises are? Yes, sir. So Mr. Henderson is the one who buzzed the intercom and his testimony is that both times that he buzzed it, it was responded to. I read his declaration and I understand, I totally understand that. I'm trying to figure out what is the noise in the background, the little beeps, what are those? So every time a jailer goes to a door inside the jail to get access, he pushes the button and it beeps. And then if she wanted to, she could also talk to the guard. But if she looks in the, in the videos and sees a guard standing at the gate, that's what the beep is for. The guards are alerting her by pushing the button on the intercom by the door that he's there at the door. And then she reaches down and you can see it on the videos and hits the access button that opens the door and allows a guard in. So that's what those noises are. Those are not noises from that cell. And the testimony relating to that, your honor, is contained in Sheriff Bridges' deposition testimony where he says, no, that's not from that cell. Those are from people being at the doorways that open automatically from pushing a button and control. And that's what those beeps were, your honor. That's an excellent point. As far as the training goes, to, to succeed on a training claim, the plaintiff has to, as a preliminary matter, show that the officers had not completed TCOL training or that TCOL training in and of itself was not constitutionally firm. This court has addressed those issues repeatedly. And this court has never held that TCOL training was not constitutionally adequate. So in order to make other arguments, just as a preliminary matter, the plaintiff would have to assert and prove that TCOL training was not adequate. And all of the jailers in the jail were TCOL trained. All right, sir, your time's up. Thank you, your honor. I appreciate it. Okay. Thank you. Mr. Davis. May it please the court. My name is Eric McGee and I- We can't hear you at all. May it please the court. Huh. Did you step on something? No, your honor. May it please the court. Can you hear me now? Yeah, sort of. May it please the court. Your honor, my name is Eric McGee and I represent Kimberly Fuentes and Jennifer Ridley. The district court properly granted summary judgment in favor of Kimberly Fuentes and Jennifer Ridley. Mr. Reed, in this case, must show and provide evidence that someone refused to treat him, that they ignored complaints related to him, they intentionally treated him incorrectly, or they engaged in some wanton disregard for his serious medical needs. That conduct must be so egregious and intentional that it is the deliberate indifference standard. What I'd like to go through here is each one. First, Ms. Kimberly Fuentes and demonstrate how the record is very clear and the evidence demonstrates that there was no refusal to treat him or anyone ignored any complaints for him. Uh, as Judge Oldham pointed out, it is, uh, you have to look at the record in its entirety. You have to look at the telephone call as well as the video evidence and the deposition testimony of the Nacogdoches County Sheriff Bridges, which actually shows and provides the evidence before this court that there was no deliberate indifference by Kimberly Fuentes. What the record actually shows occurred was that she was first contacted by the inmate who identified that he was the one that pressed the, um, emergency intercom button to contact the, uh, control room. Ms. Fuentes answered that call and he inquired only if there was a, uh, guard available to come to the cell. At that point, he called back 20 seconds later. He was answered by Ms. Fuentes and she stated that, uh, at that point, a man was down and she sent immediately two officers over the radio, uh, to the dormitory cell where he was. There was no evidence whatsoever that any intercom button from dorm one that housed Deontay Reed was ignored. What the evidence shows, as Judge Oldham asked, was that there is a noise in the background during the telephone call that she's in and Sheriff Bridges testified during his deposition. And if we go specifically to that, that's record on appeal, uh, 243 through 244 and also record on appeal, uh, 1238. 1243 and 1244 and 1238. Specifically, he said he watched the videotape. He looked at the evidence and he saw that she was doing her job, that the telephone call did not in any means impact her job performance and that she was a multitasker. Just as Mr. Davis said, during that telephone call, if you watch the video at the exact same time as that, there are individuals and lights that go on on the screen. Those lights are not associated with dorm one. Those lights are associated with, uh, intercom buttons from various locations throughout the Nacogdoches County Jail. That is correct. She testified that she did ignore an intercom button, not for dorm one. She never said she ignored an intercom button for dorm one. She did not respond to the intercom buttons for several gates. What she did do is open the gates, but she didn't speak on the intercom button to several of those officers that were moving from location to location throughout the jail. After it was dispatched that the two officers were down there, there was a jail nurse, Jennifer Ridley, who was in the control room with her. She explained that there was a man down. Jennifer Ridley left. Fuentes testified that she stayed on the intercom system with Corporal Fountain the entire time. Once Jennifer Ridley, the nurse, was down there, she notified Fuentes to contact EMS, which she dispatched immediately. There was no refusal, no delay. She stayed on the system and made sure that EMS and dispatch were fully aware of every step that was taken throughout the entire process. She opened the gates and allowed EMS to come in willingly. There is absolutely no refusal by anyone. The sheriff said that it looked like she was putting the phone conversation on hold, which she did two or three times. She was still answering emergency buttons, and those are the facts of this case. When it comes to Jennifer Ridley, Ms. Ridley was the LVN on duty. She immediately got up and responded when she heard the notification over there. There was no refusal to treat anyone. She immediately walked back there. Actually, within 40 seconds, is what the district court said. From the moment she got up, left the control room, found out the information, she obtained a pair of gloves, and she went immediately to the dorm cell. It is absolutely incorrect that she knew that she needed to start CPR. If you go and look directly into the record, what was actually done at that point is it's in record on appeal 951 and 952. What Ridley said occurred was that Mr. Reed was lying on his side. He was gasping for air, and she immediately started checking for a pulse. She determined that there was a very faint pulse when she felt it on his carotid artery. That is the point. You do not start CPR on someone who has a faint pulse and who is gasping for air. She had to make a decision at that moment whether she was going to go back herself or try to send somebody to find medical equipment, and what she says at record on appeal 951 and 952 and also page 960 was that she left. She made that determination to go back and obtain a mask for CPR, a defibrillator, and other necessary equipment such as a blood pressure cuff and a pulse oximeter, and she went back and retrieved her supervisor, Nurse Moten, and they came back to the cell. I think it's important to note in the record- Let me ask you, what was the role of the mask in the medical treatment? The role of the mask was if she needed to- Keep your voice up, please. I can't hear you. The role of the mask was that if she needed to provide a CPR- I still can't hear you. Can you hear me now? Barely. Now can you hear me? I can translate. You said the role of the mask was to enable CPR what? If it was needed at the time when she returned, and so when she returned, her supervisor, Nurse Moten, is seen on the video taking charge of the situation and performing several minutes worth of continued assessment. The entire process, the LVMs are assessing the patient to determine what his needs were. There is no deliberate indifference when you are assessing to determine it. Even if you continue watching the videotape, when EMS arrives on scene, they continue to assess Mr. Reed. There is not an immediate response. They even are trying to determine if his airway is blocked. They are obtaining the information from all the officers on scene, and then they take over the CPR that had begun at that point. But at the initial second arrival by Ms. Ridley, even Nurse Moten is seen on the videotape asking for a flashlight or a telephone so that she can turn the light on and look in his throat to determine if he's choking on something. Those are all decisions that are related to continued treatment and assessment of Deontay Reed. In no way does that arise to the level of deliberate indifference from the Easter case domino or any of the subsequent case precedent that has come out related to deliberate indifference. It shows that Nurse Ridley continued care and treatment for him. Whether hindsight 2020, she should have stayed with the patient or she should have left, those were medical judgments and decisions that she made on continued treatment for him. None of that treatment was any refusal to treat him, ignoring any issues related to him. Each and every step that she took along the way was for continued assessment and treatment of Reed. I understand that Mr. Edwards may disagree with that assessment, but that is the truth. That's the evidence that is shown in this case. There is no evidence that any person acted with deliberate indifference. What the evidence clearly shows is the one inmate that is the only evidence in this case testified to is that when he noticed that Reed was down, he contacted the control room. He was immediately answered. He doesn't say anybody ignored buttons multiple times. He said he got an immediate response and after getting that immediate response, he asked was a jailer available. When he was advised no, the reason why it was lunchtime, they were serving lunch trays, dinner time trays. Then he called back within 20 seconds, was answered again and said man down. And at that moment, 20 seconds later, two officers arrived because Fuente was doing her job in the control room. I've run out of time, your honor, but I'm happy to continue any questions that may arise. I just have one sort of background question. How many inmates is the Nacogdoches jail have? I do not know that offhand. In this dorm, I would say there was probably eight to 10 inmates in this dorm, as you can see. Well, I understand that, but the idea that it took Ms. Ridley 40 seconds to get from the control room to that dorm, that seems like quite a long time to me. I'm a fast walker. I could go pretty far in 40 seconds, and that's my frame of reference. Well, in the record, when you see the videotape, your honor, you see how the distance she actually went. That dorm that she was in, and the way I understand the Nacogdoches County Jail is there's an old jail, and then there's an addition to the old jail, and they call it the new jail. So she was going from one area of the jail all the way down the corridor into a secondary area of the jail, and so she walked the whole time. She didn't stop and visit with anybody. She went from point A to point B, which is where the dorms are, and my understanding it's in the old jail, and you even can see that when you see several different videos of EMS arriving, and even the individual that had the body camera that actually wound up showing, that's in the record as well. You see the length of time it takes them to go from the front of the jail where medical and the control room is all the way back to this. It's not just that one video with her. It's the entire record that shows the length of area they were covering. Okay, thank you, sir. Thank you, your honor. I'm sorry about the technical difficulties. Yeah. Okay, Mr. Edwards. Thank you, Justice Jones. I think what Mr. Davis and Mr. McGee are saying, and I'll also add that I have great respect for both of my opposing counsel and consider them friends, highlights the factual disputes here, okay? No one is denying what Nurse Ridley testified to, that she testified she found a fake pulse. The problem with that is Officer Fountain testified there was no pulse. Therefore, when you view the evidence in the light most favorable to the plaintiffs, there's no pulse. What's significant about that is office, I mean, Jennifer Ridley, the LVN testified that she knew the situation called for CPR in the moment and upon reflection. I mean, her testimony after being, you know, to hear them talk, you would expect, you would think she did her job appropriately. She did not. She was cited by the nursing board for abandonment likely to injure a patient. We have evidence in the record from our medical expert, Joseph Goldenson, that immediate CPR was necessary. That's record on appeal 1738. But listen to what she said. I would assess him and then start CPR. And then this is my follow-up, but I think you would tell the jury that, look, these are things that you already knew could do and that you probably should do, but in the heat of the moment, you simply didn't. That is definitionally providing incorrect treatment to a patient. Now with regards to Judge Oldham, I appreciate all I asked the court to do is to look at the record the way that Judge Hawthorne did. There is a story to be told, albeit at trial, not at summary judgment, that there were only two calls and that these intercoms are not from dorm one. That's fine. They can make that argument and there is some evidence in support of that from one inmate that he made two calls and they were responded to. The problem with that is there's also evidence in the record from another inmate that he made calls and those calls were ignored. And that is Mr. Barnhill, which is Record on Appeal 1915. And the bigger issue is that the timeline that, or the video, first of all, the video evidence is incomplete. It reflects only a minute of the overall six minutes. I can't explain why there is not video of the entirety of the event. That's an unexplained phenomenon here, but there is not video of the entirety of the event. There is, however, audio of the six minutes that Ms. Fuentes was on the call. And it is, it is, there is evidence. I don't know how to say it otherwise. The ringing tone has a distinctive tone. It is the emergency intercom, okay? That is a fact. There are five emergency intercom calls that you can see, and this is, I mean, I'm sorry, that you can hear on Record on Appeal 1034, there is an emergency intercom call three minutes and 34 seconds into that call, roughly 40 seconds after the inmate says he's down. Then again, there's a second intercom call at four minutes and 17 seconds. Then there is a third at five minutes and 55 seconds. It is four. Well, I guess I think the point is, Mr. Edwards, one can understand why everybody's freaking out, but if it, is it correct or not, they're searching that by the time a second call was received, within 20 seconds, if I recall Mr. Davis's test statement, Fuentes called 911 and Ridley got dispatched. No, it is, the record evidence is controverted. We have evidence from other inmates that they called and they were ignored. We have audio evidence supporting that. Yeah, but it doesn't matter if they were calling afterwards. If Fuentes had already taken the necessary step, I'm not excusing her failure to answer the calls, but she had done what she needed to do. Is that not correct? That's not correct. There are calls that were ignored and the Henderson call, he either has it wrong time-wise or he's at the very end, at the very end. So the facts in the light, most favorable to the plaintiff are that intercom calls were ignored. There was even a call that's, that where she said they're on their way, which wasn't true. And you know that, you know that these are intercom calls because of the distinctive sound, you know, she's supposed to say, state your emergency. You know, she doesn't say state your emergency. You can actually hear her talking to the power company at while the sound is going off and you don't hear her say, state your emergency. That by definition is ignoring the intercom. And that is three minutes and four seconds before, I want to stress this, three minutes and four seconds before she calls man down. And in a situation, and again, all you need to do to verify this is to listen to the audio time and then compare it to Mr. Potierna's call where he says, oh my God, somebody fell out of their bunk. I think he's having a stroke. And you see that it is three minutes before. So the issue isn't she did her job and then other inmates called. The issue is other inmates called. It was ignored. And then she did her job. The last thing, I know my time is out, but the last thing I'll say, again, if you cut me off, I respect that, but is that with regards to the real issue here is, you know, the court found deliberate indifference. The real issue here is, was the law clearly established enough? And was there fair warning to a control room operator that she couldn't ignore intercom calls? Okay, well, at this point, I'm sorry, but you should have made that point in your original argument. Okay. Well, I mean, it's fully briefed. We understand that. It is fully briefed, Your Honor. And I want to thank you for your time. And I will, absent any other questions, I will of course, withdraw.  And we'll carefully, Judge Oldham may have read the record, but we will all carefully examine the record. Thank you, Your Honor. Okay. Thank you, gentlemen. Appreciate it.